**fIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. _____**

**JERRY DEFORGE, JAMES FLENOURY, JOEL PEDALINE, DAVID SHARPE, FRANCES CARTER as Administrator of the ESTATE OF RONALD CARTER,**

        **Plaintiffs,**

   **v.**

**UNITED STATES OF AMERICA,**

        **Defendant.**

## COMPLAINT

Plaintiffs, complaining of Defendant, allege and say:

## INTRODUCTION

1.      For over 30 years, the water at the Marine Corps Base at Camp Lejeune ("Camp Lejeune") was contaminated with toxic chemicals known to cause cancer and a host of other chronic, often deadly, diseases. Hundreds of thousands of servicemembers and civilians drank, bathed in, cooked with, and swam in that water. Nevertheless, in violation of governing orders and basic decency, federal government officials failed to ensure that toxic chemicals from industrial facilities, fuel tanks and dry-cleaning operations did not seep into the water used by the men and women who were willing to lay their lives on the line for our Nation as well as their families. Indeed, for decades the government did not even bother to test the water despite having a legal obligation to do so. And even after government officials confirmed the contamination, they failed to warn the victims for decades that they were at increased risk for serious health problems— preventing the screening and other measures that could have saved lives and mitigated harm.

1

2. As a result of exposure to Camp Lejeune's toxic water, thousands of servicemembers and civilians who lived or worked at Camp Lejeune between the 1950s and the 1980s have contracted serious diseases and chronic conditions as a result of their exposure to the contaminated water, including cancers of the bladder, kidney, and liver, lymphoma, Parkinson's disease, and multiple myeloma. Camp Lejeune's toxic water has also been linked to widespread birth defects and high rates of stillborn babies. Indeed, one cemetery located just outside of Camp Lejeune has been called "Baby Heaven."

3. When the truth about Camp Lejeune's water finally emerged, the United States faced thousands of claims for compensation on behalf of the people injured or killed by its unlawful conduct. But instead of compensating servicemembers and others for their injuries, the United States steadfastly refused to pay their claims. When lawsuits were filed under the Federal Tort Claims Act in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose, which operated to bar the plaintiffs' claims even though the government's misconduct had not come to light until long after the statutory period had expired.

4. Now the United States has finally decided to fulfill its obligation to servicemembers, their families, and civilians who resided at the base during the period in which the water was contaminated. On August 10, 2022, the President signed the Camp Lejeune Justice Act of 2022 ("CLJA"), Pub. L. No. _____ (attached as Exhibit 1), into law.[1]

5. The CLJA establishes a new cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period to obtain

---

[1] The CLJA is section 804 of the broader Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022 ("PACT Act"). Citations to the CLJA are therefore to section 804 of the broader PACT Act. As of this filing, the PACT Act has not yet been assigned a public law number or included in United States Statutes at Large.

compensation in this Court. Under the CLJA, "[a]n individual . . . who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." CLJA § 804(b). To meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." CLJA § 804(c)(2)(A)-(B).

6.    Plaintiffs served and/or resided at Camp Lejeune. Following their time on Camp Lejeune, Plaintiffs were diagnosed with non-Hodgkin's lymphoma. Substantial evidence, including studies and reports authored by the government, links the contaminants found in the water at Camp Lejeune to non-Hodgkin's lymphoma. Plaintiffs now seek compensation under the CLJA for their substantial medical costs, loss of income, pain and suffering, and other injuries caused by the federal government's decades-long failure to ensure the safety of the water at Camp Lejeune.

## PARTIES

7.    Plaintiff Jerry Deforge is a resident of Florida. Jerry Deforge resided at Camp Lejeune for approximately six months in or around 1984.

8.    Plaintiff James Flenoury is a resident of Maryland. James Flenoury resided at Camp Lejeune for approximately six months in 1986 to 1987.

9.    Plaintiff Joel Pedaline is a resident of Florida. Joel Pedaline resided at Camp Lejeune from approximately 1975 to 1980.

10.     Plaintiff David Sharpe is a resident of Florida. David Sharpe resided at Camp Lejeune from approximately 1955 to 1959.

11.     Plaintiff Frances Carter is the Administrator of the estate of Plaintiff Ronald Carter and is the wife of Ronald Carter. Ronald Carter worked at Camp Lejeune from approximately 1967 to 2007.

12.     Defendant United States of America has waived its sovereign immunity from suit under CLJA § 804(b) and (f).

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and CLJA § 804(d), because this action arises under the Constitution and laws of the United States.

14.     Venue lies exclusively in this district under CLJA § 804(b) and (d).

## FACTUAL ALLEGATIONS

15.     Camp Lejeune is a United States Marine Corps base in Jacksonville, North Carolina.  Established in 1941, Camp Lejeune has long served as a major training and service facility for the Marine Corps.

16.     From the early 1950s to the mid-1980s, nearly one million individuals, including servicemembers, their families, and others, resided at the base at various points in time.

17.     The United States supplied water to servicemembers and other residents of Camp Lejeune.  The base's water was extracted from a large number of wells, treated at a handful of water treatment plants, and then distributed to residents using a network of distribution pipes.

18.     Camp Lejeune's housing areas were served by three main water-distribution systems—Hadnot Point (beginning in 1942), Tarawa Terrace (beginning in 1952), and Holcomb Boulevard (beginning in June 1972).  Those systems consisted of a collection of wells, water

4

treatment plants, and distribution systems. They each served a distinct area of the base, except that before 1972 the Holcomb Boulevard area was served by the Hadnot Point system.

19.    The following map, reproduced from a 2017 government report, depicts the three areas (Hadnot in green, Holcomb in pink, Tarawa in orange):



20.     Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills and leaking storage tanks, seeped into the soil and groundwater of Camp Lejeune and ultimately contaminated many of the wells used to supply the water treatment plants. However, the United States failed to conduct testing of the water that would have detected the presence of these chemicals, in clear violation of governing orders and basic duties of care.

21.     In 1979, the United States Environmental Protection Agency ("EPA") promulgated regulations governing drinking water under the Safe Drinking Water Act of 1974, 42 U.S.C. §§ 300f *et seq.* To comply with those regulations, the Camp Lejeune water utility began testing drinking water at the base.

22.     In 1982, testing determined that the drinking water at both the Hadnot Point plant and the Tarawa Terrace water treatment plant was contaminated by volatile organic compounds far in excess of safe levels. Because the two water systems operated independently of one another, they were necessarily contaminated from different sources, indicating major problems in and around Camp Lejeune.

23.     Certain water systems, including the Hadnot Point plant, were principally contaminated by trichloroethylene ("TCE"), a degreasing solvent for metal equipment. An assessment by the government in 1982 found that the level of TCE in the Hadnot Point plant was well over 1000 parts per billion. The current EPA maximum containment level for TCE is just *five* parts per billion – over *200 times* less.

24.     The water from the Hadnot Point water treatment plant was also contaminated by other volatile organic compounds, including perchloroethylene or tetrachloroethylene ("PCE"), a solvent primarily used in dry cleaning operations, as well as benzene and vinyl chloride.

6

25.     The contamination of the Hadnot Point water primarily originated from leaking underground storage tanks, industrial area spills and waste disposal sites.

26.     The Agency for Toxic Substances and Disease Registry ("ATSDR"), a component of the U.S. Department of Health and Human Services, has estimated that at least one volatile organic compound found in the Hadnot Point drinking water exceeded its current EPA maximum contaminant level at all times from August 1953 to January 1985.

27.     The principal contaminant in the water from the Tarawa Terrace water treatment plant was PCE. In 1985, a PCE level of 215 parts per billion was detected. As with TCE, the current EPA maximum containment level for PCE is only five parts per billion.

28.     The ATSDR later estimated that PCE concentrations in Tarawa Terrace drinking water exceeded the current EPA maximum contaminant level for 346 months from November 1957 to February 1987.

29.     Some of the most highly contaminated wells were shut down in February 1985.

30.     In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcombe Boulevard distribution system was intermittently contaminated by Hadnot Point water between 1972 and 1985. And as noted above, before 1972, the Holcombe Boulevard area was supplied with water by the Hadnot Point system.

31.     In 1989, the EPA named both Camp Lejeune and ABC One-Hour Cleaners "Superfund" sites under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq*.

## II.     ATSDR Studies Establish Long-Term Contamination of Camp Lejeune Water and a Significant Risk of Harm to Servicemembers and Civilians

32.     As required by CERCLA, the ATSDR conducted a Public Health Assessment of Camp Lejeune. The ATSDR completed its initial assessment in 1997.

7

33.     The 1997 ATSDR Public Health Assessment concluded that individuals who served or resided at Camp Lejeune had been exposed to contaminants of concern in the drinking water.  It declared those exposures to be a public health hazard.

34.     The 1997 ATSDR Public Health Assessment was removed from the agency's website in 2009 after new information emerged, including the fact that benzene had been present in a well in the Hadnot Point system.

35.     After the removal of the 1997 Public Health Assessment, the ATSDR completed five health studies[2] of Camp Lejeune:

        a.     A 2013 study of whether *in utero* and infant exposures to contaminated drinking water were associated with birth defects; the results suggested an association between drinking water contaminants and neural tube defects.

        b.     A 2014 study compared mortality rates among Marine and naval personnel stationed at Camp Lejeune with mortality rates for Marine Corps personnel stationed at Camp Pendleton, a similarly-sized Marine Corps base located in Oceanside, California. The study found an elevated mortality rate for the Camp Lejeune personnel for several causes of death, including multiple myeloma, lymphoma, and cancers of the kidney, liver, esophagus, and cervix.

        c.     A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

        d.     A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues.

---

[2] https://www.atsdr.cdc.gov/sites/lejeune/health-studies.html.

It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

      e.     A 2015 study identified associations between exposure to PCE and other chemicals in the Camp Lejeune drinking water and male breast cancer.

36.     In addition to those studies, the ATSDR employed water-modeling techniques and historical reconstruction to estimate concentrations of particular contaminants in drinking water over time and to determine the level and duration of human exposure to contaminated drinking water.

37.     In January 2017, the ATSDR published a superseding Public Health Assessment[3] for Camp Lejeune.

38.     The 2017 Public Health Assessment reached a number of conclusions about the water supply at Camp Lejeune:

      a.     **Hadnot Point Water System.** The 2017 Public Health Assessment concluded that "[r]esidents, workers, Marine and naval personnel, and Marines-in-training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied by the Hadnot Point [water treatment plant]." It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects." According to the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

---

[3] https://www.atsdr.cdc.gov/sites/lejeune/2017-PHA.html.

9

b.    **Tarawa Terrace Water System**.  The 2017 Public Health Assessment concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

c.    **Holcomb Boulevard Water System**.  The 2017 Public Health Assessment concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."

d.    **Lead exposure**.  The 2017 Public Health Assessment concluded that "past exposure to lead found in tap water at 19 locations could have harmed people's health."

e.    **Other Exposures**.  The 2017 Public Health Assessment concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

39.    The ATSDR also released a report in January 2017 entitled "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases."[4]  The report evaluated the link between the contaminants found in the water at Camp Lejeune and various diseases and chronic conditions.  It found either "[s]ufficient evidence for causation" or "[e]quipoise and above evidence for causation" for the following diseases or

---

[4]

https://www.atsdr.cdc.gov/sites/lejeune/docs/atsdr_summary_of_the_evidence_for_causality_tce_pce_508.pdf.

chronic conditions with respect to at least one of the contaminants: kidney cancer, non-Hodgkin's lymphoma, multiple myeloma, leukemias, liver cancer, bladder cancer, Parkinson's disease, kidney diseases, systemic sclerosis/scleroderma, and cardiac defects.

40.     Independent studies have also found a causal relationship between the chemicals found in the water at Camp Lejeune and certain diseases and chronic conditions.

III.    **Congress and the Executive Branch Affirm the Link Between the Contamination of Camp Lejeune's Water and a Multitude of Cancers and Other Serious Diseases and Conditions**

41.     Through statutory enactments and regulatory actions, Congress and the Executive Branch have both recognized the link between exposure to Camp Lejeune's contaminated water and a number of serious diseases and conditions.

42.     In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp Lejeune Families Act, Pub. L. No. 112-554, 126 Stat. 1165.  Title I of the statute is entitled the Janey Ensminger Act, in honor of a nine-year-old girl who died of a cancer that she developed from exposure to the water at Camp Lejeune.  *Id.* § 101, 126 Stat. 1167.

43.     The Janey Ensminger Act provides that veterans and their families (including babies who were *in utero*) who served or resided at Camp Lejeune for at least 30 days between 1957 and 1987 are entitled to receive hospital care and medical benefits for fifteen specified illnesses or conditions without having to prove a connection between a veteran's military service and the illness or condition.  38 U.S.C. §§ 1710(e)(1)(F), 1787(a) (2012). Those illnesses and conditions are esophageal cancer, lung cancer, breast cancer, bladder cancer, kidney cancer, leukemia, multiple myeloma, myleodysplasic syndromes, renal toxicity, hepatic steatosis, female infertility, miscarriage, scleroderma, neurobehavioral effects, and non-Hodgkin's lymphoma. 38 U.S.C. § 1710(e)(1)(F).

11

44. Congress later expanded the pool of victims eligible for hospital care and medical benefits to those who had served or resided at Camp Lejeune as early as August 1, 1953. Consolidated and Further Continuing Appropriations Act, 2015, Div. I, Tit. I, § 243, Pub. L. No. 113-235 (codified at 38 U.S.C. § 1710(e)(1)(F)).

45. In January 2017, the U.S. Department of Veterans Affairs promulgated a regulation establishing that veterans exposed to the water at Camp Lejeune are entitled to certain disability benefits. Final Rule, Diseases Associated With Exposure to Contaminants in the Water Supply at Camp Lejeune, 82 Fed. Reg. 4173 (Jan. 13, 2017). The regulation provides that a veteran who served at least 30 days at Camp Lejeune between August 1, 1953, and December 31, 1987, "shall be presumed to have been exposed during such service to the contaminants in the water supply." 38 C.F.R. § 3.307(a)(7)(iii). The regulation further provides that if the veteran develops one of eight specified diseases, the Department of Veterans Affairs "will presume that the individual concerned became disabled during that service" for certain purposes. 38 C.F.R. § 3.307(a)(7)(iv). Those eight diseases include two diseases not covered by the Janey Ensminger Act—liver cancer and Parkinson's disease—in addition to bladder cancer, kidney cancer, adult leukemia, multiple myeloma, aplastic anemia and other myelodysplastic syndromes, and non-Hodgkin's lymphoma. 38 C.F.R. § 3.309(f).

46. Although the 2017 rule provides disability benefits to servicemembers, it does not provide other forms of compensation and it does not provide any compensation for non-servicemembers who were injured by the contaminated water at Camp Lejeune.

## IV. The Multi-District Litigation Under the Federal Tort Claims Act Is Dismissed Under North Carolina's Statute of Repose

47. Over a half century after the water at Camp Lejeune first became contaminated, the United States Navy began notifying affected individuals about "past water quality issues" at Camp

Lejeune. In light of that disclosure, over four thousand veterans and other individuals filed administrative claims with the Navy seeking compensation for the injuries.

48. A number of injured servicemembers and others whose administrative claims were denied brought suits against the United States in various federal district courts under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

49. As a general matter, the complaints alleged that the government was negligent in its maintenance of the water supply system at Camp Lejeune and had failed to comply with its duty to warn servicemembers and others about their risk of developing cancer and other diseases and conditions from exposure to the water at Camp Lejeune. The complaints explained that the United States had a legal duty to ensure that the water supply was safe for drinking and other purposes, properly constructing wells, and ensuring that the wells could not be contaminated by the surrounding land. The complaints pointed to orders issued by the Department of Navy Bureau of Medicine and Surgery in 1972, known as "BUMEDS," that imposed a detailed set of requirements for ensuring water safety—orders that the United States had failed to follow.

50. The complaints further alleged that United States personnel had themselves caused or permitted large quantities of chlorinated solvents and other contaminants to be dumped or disposed of within Camp Lejeune without warning residents. The complaints also alleged that even after the United States knew or should have known that the water supply was dangerously contaminated, it failed to take the necessary steps to warn at-risk individuals and correct the problem.

51. In 2011, the Camp Lejeune cases were consolidated in a Multi-District Litigation (MDL) in the Northern District of Georgia (MDL No. 2218).

13

52.     On December 15, 2016, the District Court dismissed the claims without reaching the merits of the plaintiffs' negligence and duty-to-warn claims. *See In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). The court based its dismissal in whole or in part on three alternative grounds: (i) the claims were barred by North Carolina's ten-year statute of repose, *see id.* at 1340; (ii) at least some of the claims brought by servicemembers were barred by the doctrine of *Feres v. United States*, 340 U.S. 135 (1950), *see Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d at 1342–1343; and (iii) the claims were barred by the FTCA's discretionary-function exception, 28 U.S.C. § 2680(a), *see id.* at 1360.

53.     On May 22, 2019, the U.S. Court of Appeals for the Eleventh Circuit affirmed the district court's dismissal. *See In re Camp Lejeune, North Carolina Water Contamination Litig.*, 774 F. App'x 564 ([1]1th Cir. 2019). The Court of Appeals based its affirmance exclusively on the North Carolina statute of repose and thus did not reach the other grounds for the District Court's decision. *Id.* at 568.

54.     In the wake of the District Court's decision, the Navy elected to deny all of the thousands of pending claims seeking compensation for harms caused by the government's failure to ensure safe water at Camp Lejeune. The Navy took the position that it lacked the legal authority to pay the claims in light of the district court's ruling.

## V.     Congress Enacts the Camp Lejeune Justice Act

55.     On August 10, 2022, the President signed into law the Camp Lejeune Justice Act. *See* Exhibit 1; *supra* ¶ 4 & n.1. The text of the legislation supersedes the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune and creates a new federal cause of action. As the President stated following Senate passage of the Act, the bill "could be the difference between life and death for many suffering from toxic related illnesses. For the spouse or child of a servicemember who died from toxic exposure,

14

struggling to put their lives back together, this bill will be a lifeline. . . . I have long said we have

a lot of obligations as a nation, but we have only one sacred obligation—to prepare and equip those

we send to war and to take care of them and their families when they come home."[5]

56.     Section 804(b) of the CLJA establishes a new federal cause of action specifically

for those affected by the extensive contamination at Camp Lejeune.  It provides that:

> An individual, including a veteran (as defined in section 101 of title 38, United
> States Code), or the legal representative of such an individual, who resided, worked,
> or was otherwise exposed (including in utero exposure) for not less than 30 days
> during the period beginning on August 1, 1953, and ending on December 31, 1987,
> to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of,
> the United States may bring an action in the United States District Court for the
> Eastern District of North Carolina to obtain appropriate relief for harm that was
> caused by exposure to the water at Camp Lejeune.

57.     The statute requires that a claim must be presented to the relevant federal agency it

can proceed.  CLJA § 804(h) (cross-referencing 28 U.S.C. § 2675).  Under that provision, if the

federal agency fails to make a final disposition of a claim within six months of its filing, the

claimed is "deemed" denied, allowing the claimant to file an action in court.  28 U.S.C. § 2675(a).

58.     The CLJA makes clear that a plaintiff may obtain a recovery for "a latent disease."

CLJA § 804(e)(1).

59.     To meet the burden of proof under the CLJA, a plaintiff must "produce evidence

showing that the relationship between exposure to the water at Camp Lejeune and the harm is—

(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a

causal relationship is at least as likely as not."  CLJA § 804(c)(2).

60.     The CLJA includes its own statute of limitations and expressly makes inapplicable

any other statutes of repose or limitations.  CLJA § 804(j)(2) and (3).  The CLJA's statute of

---

[5]     https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/02/statement-by-president-joe-biden-on-senate-passage-of-the-bipartisan-pact-act/

15

limitations provides that "[a] claim in an action under this section may not be commenced after the later of—(A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." CLJA § 804(j)(2).

## VI. Jerry Deforge's Service at Camp Lejeune and Diagnosis of non-Hodgkin's Lymphoma

61.     Jerry Deforge was born on April 24, 1964.

62.     Jerry Deforge served at Camp Lejeune for approximately six months in or about 1984.

63.     Jerry Deforge resided at the Camp Geiger barracks while participating in infantry and mortarman training.  Jerry Deforge was exposed to water contaminated with toxic chemicals for approximately half a year.  Jerry Deforge drank the water and used the water for bathing, cooking, and/or swimming.

64.     In or about 2001, Jerry Deforge was diagnosed with non-Hodgkin's lymphoma, among other ailments including but not limited to enlarged prostate, enlarged liver, and kidney problems.

65.     Jerry Deforge's exposure to the toxic chemicals caused his non-Hodgkin's lymphoma and other harms and injuries. Multiple government-authored studies and reports have concluded that there is sufficient evidence that chemicals present in the water at Camp Lejeune, including benzene and TCE, cause non-Hodgkin's lymphoma and leukemia, among other injuries. In its analyses of Camp Lejeune water exposure, the ASTDR has assigned these studies—which include meta-analyses of the results from multiple studies—significant weight and credibility.

66. Jerry Deforge has suffered significant harm as a result of his non-Hodgkin's lymphoma and other injuries, including significant medical expenses, past and ongoing treatment, and pain and suffering.

67. In December 2011, Jerry Deforge filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. The Navy denied the claim or else the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of it within six months of the date of filing or else the Navy proposed an unacceptable resolution of the claim.

## VII. James Flenoury's Service at Camp Lejeune and Diagnosis of non-Hodgkin's Lymphoma

68. James Flenoury was born on October 29, 1965.

69. James Flenoury served at Camp Lejeune for approximately six months in or about 1986 to 1987.

70. James Flenoury was stationed at Camp Lejeune for communications training. He was exposed to water contaminated with toxic chemicals for a period of approximately half a year. James Flenoury drank the water and used the water for bathing, cooking, and/or swimming.

71. In approximately 2010, James Flenoury was diagnosed with non-Hodgkin's lymphoma. He has also suffered from neuropathy and low testosterone, among other injuries.

72. James Flenoury's exposure to the toxic chemicals caused his non-Hodgkin's lymphoma. Multiple government-authored studies and reports have concluded that there is sufficient evidence that chemicals present in the water at Camp Lejeune, including benzene and TCE, cause non-Hodgkin's lymphoma and leukemia, among other injuries. In its analyses of Camp Lejeune water exposure, the ASTDR has assigned these studies—which include meta-analyses of the results from multiple studies—significant weight and credibility.

17

73.    James Flenoury has suffered significant harm as a result of his non-Hodgkin's lymphoma and other injuries, including significant medical expenses, past and ongoing treatment, and pain and suffering.

74.    In May 2013, James Flenoury filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  The Navy denied the claim or else the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of it within six months of the date of filing or else the Navy proposed an unacceptable resolution of the claim.

## VIII.    Joel Pedaline's Service at Camp Lejeune and Diagnosis of non-Hodgkin's Lymphoma

75.    Joel Pedaline was born on December 9, 1958.

76.    Joel Pedaline served at Camp Lejeune from approximately 1975 to 1980.

77.    Joel Pedaline was thus exposed to water contaminated with toxic chemicals for approximately five years.  Joel Pedaline drank the water and used the water for bathing, cooking, and swimming.

78.    Following his time at Camp Lejeune, Joel Pedaline was diagnosed with non-Hodgkin's lymphoma, Type II diabetes, and psoriatic arthritis among other injuries.

79.    Joel Pedaline's exposure to the toxic chemicals caused his non-Hodgkin's lymphoma.  Multiple government-authored studies and reports have concluded that there is sufficient evidence that chemicals present in the water at Camp Lejeune, including benzene and TCE, cause non-Hodgkin's lymphoma and leukemia, among other injuries. In its analyses of Camp Lejeune water exposure, the ASTDR has assigned these studies—which include meta-analyses of the results from multiple studies—significant weight and credibility.

18

80.     Joel Pedaline has suffered significant harm as a result of his non-Hodgkin's lymphoma and other injuries, including significant medical expenses, past and ongoing treatment, and pain and suffering.

81.     In February 2011, Joel Pedaline filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  The Navy denied the claim or else the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of it within six months of the date of filing or else the Navy proposed an unacceptable resolution of the claim.

## IX.     David Sharpe's Service at Camp Lejeune and Diagnosis of non-Hodgkin's Lymphoma

82.     David Sharpe was born on March 14, 1936.  David Sharpe served in the U.S. Marine Corps from approximately 1954 to 1967.  He retired from the Marine Corps with an honorable discharge in 1967.

83.     David Sharpe served at Camp Lejeune from approximately 1955 to 1959.

84.     During the period in which David Sharpe resided at Camp Lejeune, he lived in the Tarawa Terrace area.  David Sharpe was exposed to water contaminated with toxic chemicals for a period of approximately four years.  David Sharpe drank the water and used the water for bathing, cooking, and/or swimming.

85.     Following his time at Camp Lejeune, David Sharpe was diagnosed with non-Hodgkin's lymphoma, prostate cancer, skin cancer, and other serious illnesses.

86.     David Sharpe's exposure to toxic chemicals caused his non-Hodgkin's lymphoma and other illnesses.  Multiple government-authored studies and reports have concluded that there is sufficient evidence that chemicals present in the water at Camp Lejeune, including benzene and TCE, cause non-Hodgkin's lymphoma and leukemia, among other injuries. In its analyses of Camp

19

Lejeune water exposure, the ASTDR has assigned these studies—which include meta-analyses of the results from multiple studies—significant weight and credibility.

87.     Plaintiff has suffered significant harm as a result of his non-Hodgkin's lymphoma non-Hodgkin's lymphoma and other injuries, including significant medical expenses, past and ongoing treatment, and pain and suffering.

88.     In February 2011, Plaintiff filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  The Navy denied the claim or else the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of it within six months of the date of filing or else the Navy proposed an unacceptable resolution of the claim.

**X.     Ronald Carter's Work at Camp Lejeune and Diagnosis of non-Hodgkin's Lymphoma**

89.     Ronald Carter was born on September 22, 1948.  Ronald Carter worked at Camp Lejeune from approximately 1968 to 2007.

90.     During the period in which Ronald Carter was exposed to water contaminated with toxic chemicals for a period of approximately four years.  Ronald Carter drank the water and used the water for bathing, cooking, and/or swimming.

91.     Following his time at Camp Lejeune, Ronald Carter was diagnosed with non-Hodgkin's lymphoma, among other serious illnesses.

92.     Ronald Carter's exposure to toxic chemicals caused his non-Hodgkin's lymphoma and other illnesses.  Multiple government-authored studies and reports have concluded that there is sufficient evidence that chemicals present in the water at Camp Lejeune, including benzene and TCE, cause non-Hodgkin's lymphoma and leukemia, among other injuries. In its analyses of Camp Lejeune water exposure, the ASTDR has assigned these studies—which include meta-analyses of the results from multiple studies—significant weight and credibility.

93.     Ronald Carter has suffered significant harm as a result of his non-Hodgkin's lymphoma and other injuries, including significant medical expenses, past and ongoing treatment, and pain and suffering. Ronald Carter recently passed away.

94.     In December 2013, Plaintiff filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675.  The Navy denied the claim or else the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of it within six months of the date of filing or else the Navy proposed an unacceptable resolution of the claim.

## COUNT ONE: CAMP LEJEUNE JUSTICE ACT

95.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

96.     Plaintiffs resided at Camp Lejeune, North Carolina, during the relevant time period under the CLJA.

97.     During Plaintiffs' period of residency at Camp Lejeune, Plaintiffs were exposed to water that was supplied by, or on behalf of, the United States.

98.     Following their time at Camp Lejeune, Plaintiffs were diagnosed with non-Hodgkin's lymphoma.

99.     A causal relationship exists between Plaintiffs' exposure to the water at Camp Lejeune and Plaintiffs' diagnosis of non-Hodgkin's lymphoma.  The existence of the causal relationship is at least as likely as not.

100.    Plaintiffs presented a claim for money damages arising out of their exposure to the water at Camp Lejeune to the United States Navy.  The United States Navy failed to make a final disposition of the claim within six months, denied the claim, or proposed to resolve the claim for an inadequate amount of compensation, and thus Plaintiff rejected the Navy's proposal.

101.    As a consequence of Plaintiffs' non-Hodgkin's lymphoma, Plaintiffs have suffered and will continue to suffer significant harm, including (but not limited to) medical costs, pain and suffering, and a reduced life expectancy.

## CLAIM FOR RELIEF

## (CLJA)

102.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

103.    Plaintiffs are qualified to bring a cause of action under the CLJA.  CLJA § 804(b).

104.    During the pertinent times, Plaintiffs were exposed to one or more pertinent substances at Camp Lejeune and suffered harm that was caused by exposure to the water at Camp Lejeune within the meaning of CLJA § 804(b).

105.    With regard to the Plaintiffs herein, the relationship between the exposure to the water at Camp Lejeune and the harm is sufficient to conclude that a causal relationship exists, or, sufficient to conclude that a causal relationship is at least as likely as not, under CLJA § 804(c)(2).

106.    Plaintiffs have satisfied all applicable statutes of limitation and or repose or other relevant conditions precedent to the filing of the instant action.

107.    Wherefore, Plaintiffs respectfully requests that pursuant to CLJA § 804(b) the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiffs that was caused by exposure to the water at Camp Lejeune.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  August 10, 2022

*s/ Kristen Alkire*
Kristen Alkire (NCSB 44618)
Aimee Wagstaff (*pro hac vice forthcoming*)
Benjamin Gillig (*pro hac vice forthcoming*)
WAGSTAFF LAW FIRM
940 Lincoln Street
Denver, CO 80203
Phone 303-376-6360
kalkire@wagstafflawfirm.com
awagstaff@wagstafflawfirm.com
bgillig@wagstafflawfirm.com

*s/ Eric W. Flynn*
Eric W. Flynn (NCSB 57615)
J. Edward Bell, III (*pro hac vice forthcoming*)
BELL LEGAL GROUP
219 Ridge Street
Georgetown, SC 29440
eflynn@belllegalgroup.com
jeb@belllegalgroup.com
Phone (843) 546-2408
Fax (843) 546-9604

*Counsel for Plaintiffs*
